UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY DOCKERY,                      :
                                      :
            Plaintiff                 :
                                      :
      v.                              :  CIVIL NO. 3:CV-11-1368
                                      :
SEC. OF CORRECTIONS M. WETZEL,  :  (Judge Kosik)
et al.,                               :
                                      :
            Defendants

## MEMORANDUM

Plaintiff, Timothy Dockery, filed this civil rights action pursuant to 42 U.S.C.

§ 1983.  He is currently confined at the State Correctional Institution at Greene,

Pennsylvania.  Named as Defendants are Pennsylvania Department of Corrections

("DOC") officials and employees at SCI-Frackville, Plaintiff's former place of

confinement.  Plaintiff sets forth religious claims under the Religious Land Use and

Institutionalized Persons Act[1] ("RLUIPA") and the First Amendment.  He also raises

challenges with respect to the lawfulness of the Secured Special Needs Unit

("SSNU") program and his placement therein. (Doc. 1, Compl.)   Before the court is

Defendants' motion for summary judgment. (Doc 64.)

---

[1] See 42 U.S.C. § 2000cc-1(a).

## I.    Background

Named as Defendants are the following DOC officials:   Secretary John E. Wetzel; Deputy Secretary for the Eastern Region Michael D. Klopotoski; and Anthony Kovalchik, Deputy Superintendent of Centralized Services.  Also named are the following SCI-Frackville employees: Robert Collins, former Superintendent; Shawn Kephart, Director of the Bureau of Treatment Services; Larry Liggitt, former Facility Chaplaincy Program Director; and Joanne Miranda, Unit Manager.

Plaintiff alleges that Defendants violated his First Amendment rights and his statutory rights under RLUIPA by denying his religious accommodation requests to be provided a Halal diet with meat, and to participate in Jumu'ah services while incarcerated in the SSNU at SCI-Frackville.  He further alleges that his due process rights were violated by his placement in the SSNU without a full administrative hearing, and contends that the SSNU program violates his constitutional rights because it is not licensed to operate and administer psychiatric and psychological treatment to inmates.  He seeks declaratory, injunctive and monetary relief.[2]

Defendants filed an answer to the complaint on October 24, 2011.  Thereafter, the parties engaged in discovery.  The court granted in part and denied in part a

---

[2] Because Plaintiff is no longer confined at SCI-Frackville, any request for declaratory or injunctive relief is now moot. See Abdul-Akbar v. Watson, 4 F.3d 195, 206-07 (3d Cir. 1993)(A prisoner's transfer or release from prison moots his claims for injunctive or declaratory relief since he is no longer subject to the conditions he alleges are unconstitutional).

motion to compel discovery filed by Plaintiff on March 18, 2013.  Discovery is now

closed.  Ripe for consideration is Defendants' motion for summary judgment.[3]

## II.   Standard of Review

Summary judgment is proper where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  In making this evaluation, the court must determine

"whether the pleadings, depositions, answers to interrogatories, admissions on file,

and affidavits show that there is no genuine issue of material fact and whether the

moving party is therefore entitled to judgment as a matter of law." MacFarlan v. Ivy

Hill SNF, LLC, 675 F.3d 266, 271 (3d Cir. 2012)(citing Celotex Corp. v. Catrett, 477

U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)).

When deciding the existence of a genuine dispute of material fact, the court

will award all reasonable inferences to the non-moving party.  Meyer v. Riegel

---

[3] On August 18, 2014, Plaintiff filed a motion for leave to file a sur-reply brief to Defendants' reply brief regarding their summary judgment motion. (Doc. 81.) Plaintiff's motion will be denied for the following reasons. First, he claims that Defendants' reply brief is untimely. Defendants were granted an enlargement of time until July 23, 2014 to submit their reply, and the brief was timely filed on said date. Further, Plaintiff's contention that Defendants' reply brief contains arguments that were not raised in their brief in support of summary judgment is without merit. The reply brief contains arguments responsive to Plaintiff's brief in opposition to summary judgment, and does not raise any arguments not contained in Defendants' supporting brief. Because the court has addressed Plaintiff's motion on the merits, Defendants' pending motion to strike Plaintiff's brief in support of the motion (Doc. 86) will be dismissed as moot.

Products Corp., 720 F.2d 303, 307 n. 2 (3d Cir. 1983).  However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.'" Roth v. Norfalco, 651 F.3d 367, 373 (3d Cir. 2011)(citing Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011)).

"[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. Liberty Lobby, 477 U.S. at 256-57, 106 S. Ct. at 2514.  It is well-settled that: "[o]ne cannot create an issue of fact merely by ... denying averments ... without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted).  Thus, allegations made without evidentiary support may be

4

disregarded.  <u>Jones v. UPS</u>, 214 F.3d 402, 407 (3d Cir. 2000).

## III.   Statement of Facts[4]

Defendants submitted a Statement of Undisputed Material Facts in support of their motion for summary judgment. (Doc. 65.)  The evidentiary materials submitted in support of these facts consist of the Declarations of Peter Damiter, Assistant to the Superintendent at SCI-Frackville; Rev. Ulrich Klemm, Administrator for Religion and Volunteer Services; Defendant Liggitt, Chaplaincy Program Director at SCI-Frackville; Marcia Noles, DOC Chief of Food Services Division; and Robert J. Marsh, Licensed Psychologist Director for the DOC.  (Doc. 66 at Exs. A-D, F.) Defendants also submit portions of Plaintiff's deposition transcript. (<u>Id.</u>, Ex. E.)

Plaintiff has submitted a Statement of Material Facts responding to Defendants' statement.  Evidentiary materials supporting Plaintiff's statement include DOC policy and procedure statements pertaining to the SSNU and religious activities, grievances and appeals therefrom, declarations from inmates William Pratt and Ravanna Spencer, and a copy of an investigation conducted by the U.S. Department of Justice into matters at the State Correctional Institution at Cresson. (Docs. 75-1 through 75-9.)

The following facts are undisputed by the parties.  Where facts are contested,

---

[4] Unless otherwise noted, all citations to the record reflect the docket number and page number assigned by the Official Court Electronic Document Filing System (CM/ECF), rather than to the page numbers of the original documents.

the court will so note.  Plaintiff is serving a life sentence for murder.  On May 19, 2010, he was transferred from SCI-Cresson to the SSNU at SCI-Frackville and was confined there from May 20, 2010 to August 4, 2011.  (Doc. 66-1, Damiter Decl. ¶ 19.)  While Defendants state that Plaintiff was transferred to the SSNU due to mental health, disciplinary and security concerns, Plaintiff disputes that these were the reasons.  (Id.)  He was transferred out of the SSNU on August 4, 2011 and did not return to this unit during the remainder of his SCI-Frackville confinement.  He was transferred to SCI-Fayette on September 17, 2013.

The SSNU is designed to provide an inmate who has significant mental health concerns, and numerous Restricted Housing Unit placements resulting in substantial disciplinary custody time, the opportunity of having a specialized treatment program to assist him in returning to a general population Special Needs Unit or other appropriate disposition.  The SSNU is classified as a Level 5 housing unit.  (Id. ¶ 20; Doc. 74 ¶ 7.)

When an inmate is being recommended for SSNU placement, the Program Review Committee reviews the recommendation with the inmate and informs him of the reasons for the transfer recommendation. The inmate is given the opportunity to respond and object to the SSNU placement, and may appeal the recommendation for transfer to the Superintendent and Central Office. (Doc. 66-1 ¶ 21.)

Pursuant to DOC Administrative Directive 804, an inmate may file a

grievance regarding actions or policies of the DOC or DOC employees by submitting the grievance in writing to the Facility Grievance coordinator.  If dissatisfied with the decision, he can then appeal to the Superintendent.  An appeal from the Superintendent's decision can be filed with the Secretary's Office of Inmate Grievances and Appeals.  An inmate has not exhausted the grievance procedure unless he properly appeals his grievance to the Secretary's Office.  (Id. ¶¶ 3-6.)

DOC policy for religious activities is set forth in DOC Administrative Directive 819.  The DOC is committed to providing inmates with the opportunity to practice the basic tenets of their faith through religious programs and services, while guarding against the misuse of inmates claiming religious beliefs to obtain privileges or breach security.

State Correctional Institutions provide ecumenical services for major faith groups, which represent the whole body of a particular faith group.  Worship services for major faith groups, including Catholics, Jehovah's Witnesses, Jewish, Muslims, Native Americans and Protestants, are provided in all institutions unless there is a temporary vacancy.  Religious leaders are approved by the DOC to assure that worship is in accordance with the tenets of the faith groups, and to guard against security concerns.  (Doc. 66-1 ¶¶ 7-10; Doc. 66-2, Klemm Decl. ¶¶ 6-9; Doc. 66-3 Liggitt ¶¶ 6-8.)  Defendants state that diversity of worship and reasonable

accommodations are made by the DOC consistent with safety concerns. (Doc. 66-1 ¶ 11; Doc. 66-2 ¶ 10; Doc. 66-3 ¶ 9.) However, Plaintiff disputes this statement claiming that reasonable accommodations are not made for Muslim inmates with respect to Halal diets and Jumu'ah services, citing to the denial of his requests pertaining to these issues.

Inmates with any concerns regarding accommodations of a particular faith group are to express their concerns to the DOC's Religious Accommodation Review Committee ("RARC"), via an Inmate Religious Accommodation Request Form (DC-52). In accordance with DC-ADM 819, an Inmate Religious Accommodation Request Form must be submitted to the Facility Chaplain Program Director ("FCPD"). (Doc. 66-1 ¶¶ 12, 13; Doc. 66-2 ¶¶ 11, 12; Doc. 66-3 ¶¶ 10, 11.) Plaintiff disputes Defendants' statement that an inmate is encouraged to obtain written information from his outside faith group, including publications describing the goals, beliefs and practices of the group, and provide such information to the FCPD for review. He claims that DC-ADM 819 does not mention this.

Prison staff evaluate an inmate's request for a religious accommodation and then forward the request to the RARC. After reviewing the request, the RARC makes a recommendation to the Regional Deputy Secretary. The Facility Manager and the FCPD of the involved institution are then notified of the decision. If dissatisfied with the decision, an inmate may file a grievance in accordance with

DC-ADM 804. (Doc. 66-1 ¶¶ 15, 16; Doc. 66-2 ¶¶ 14, 15; Doc. 66-3 ¶¶ 13, 14.)

The parties agree that pursuant to DC-ADM 819, Custody Level 5 inmates, including those housed in the SSNU, are not permitted to attend religious services and programs which take place within the prison's general population. Due to security concerns, Custody Level 5 inmates are not permitted to leave their units to attend these activities within the general population. While Defendants state that services and programs for Level 5 inmates take place at the inmate's cell by visitation from the staff Chaplains, Plaintiff disputes this statement. He claims that inmates housed in the SSNU are governed by Procedure Manual 13.8.1 and allowed religious programs and services outside of their cells once promoted to a Phase 3 or 2. (Doc. 66-1 ¶ 17; Doc. 66-2 ¶16; Doc. 66-3 ¶ 15; Doc. 75-1 at 1.)

The DOC offers two types of religious diets to meet the needs of inmates – the "No Animal Products" diet, which consists of no animal products or by-products in any of the food on the menu, and the "Kosher Bag" diet, which consists of kosher food products that are served on the regular menu, but handled differently to accommodate the kosher dietary laws for food handling. The Kosher Bag diet does not contain kosher meat. In addition, inmates may select the Alternative Protein option offered on mainline at lunch and supper meals. (Doc. 66-4, Noles Decl. ¶¶2,3; Doc. 66-2 ¶17; Doc. 66-3 ¶16.)

Defendants state that of the DOC's more than 5,000 Muslim inmates, a

significant number choose to eat the Alternative Protein offered at mainline or submit a religious accommodation request in order to seek approval for the "No Animal Products" diet, as consistent with Islamic religious dietary beliefs. While Plaintiff disputes that Defendants would have knowledge of any such information, Defendants submit the declaration of Marcia Noles, Chief of the Food Services Division with the Pennsylvania Department of Corrections, in support of these statistics.  (Doc. 66-4, Noles Decl. ¶4.) Plaintiff submits nothing to contradict this information.

Plaintiff disputes Defendants' statement that the DOC does not offer a Halal diet with meat for legitimate penological reasons of significant additional expense and burden on staff and facilities.  He states that a Halal meat diet can be served to Muslim inmates in a rational way related to legitimate penological interests that comply with security and budget concerns.  He disputes that the DOC would be required to purchase additional equipment, utilize additional staff, coordinate additional food deliveries, or be forced to serve kosher meat to the Jewish inmates if a Halal meat diet were to be served.  Plaintiff does not cite to any evidentiary materials in support of his conclusions.

Plaintiff admits that he chose to eat the Alternative Protein option offered at the SCI-Frackville mainline, but disputes that the only reason this option does not meet the requirements of a Halal diet is because it does not include Halal meat.

10

Rather, he claims that Halal meat is only one aspect of a Halal diet. (Doc. 66-5, Pl.'s Dep. at 20-22.)

While confined at SCI-Frackville, Plaintiff submitted two Inmate Religious Accommodation Request Forms (DC-52) based upon his Muslim beliefs. On September 10, 2010, he requested that he be permitted to attend the weekly Muslim Jumu'ah services held every Friday in the prison's general population. In the alternative, he requested that Jumu'ah services be broadcast to the SSNU via closed circuit television. (Doc. 66-1 ¶23; Doc. 66-2 ¶20; Doc. 66-3 ¶19.)

In October of 2010, the RARC reviewed this request. At the time, Plaintiff was a Custody Level 5 inmate housed in the SSNU. Pursuant to DC-ADM 819 and for safety reasons, he was not permitted to leave the SSNU to attend religious services. As such, the RARC recommended that his request be denied. In January of 2011, the Regional Deputy Secretary concurred with the RARC and denied Plaintiff's request. The rationale for the denial was based on DOC policy and security reasons finding that religious services for Level 5 inmates take place at their cells through rounds conducted by facility and contract Chaplains. In addition, the taping of services for airing on the institutional channel does not take place at SCI-Frackville. (Doc. 66-1 ¶ 24; Doc. 66-2 ¶ 21; Doc. 66-3 ¶21.) Plaintiff disputes these statements to the extent that he claims that inmates in Phases 3 or 2 of the SSNU are allowed out-of-cell religious services and activities, and claims

that airing the services to SSNU inmates at SCI-Frackville is an available alternative.

Defendants state that pursuant to DOC policy, inmates housed in the SSNU who are on Phase 5 through 3 status are not permitted television privileges for disciplinary and security reasons. Once Phase 2 status is earned, in-cell television use with earphones is permitted. (Doc. 66-1, Damiter Decl. ¶ 26.) Plaintiff disputes this statement contending that Phase 3 SSNU inmates are permitted dayroom privileges and can watch television there, but offers no evidentiary support. This statement is also contradicted by the SSNU Privileges Chart submitted by Plaintiff which clearly reveals that SSNU inmates in Phases 5 through 3 are not permitted television privileges. (Doc. 75-1 at 1-2, SSNU Privileges Chart.)

On August 31, 2010, Plaintiff filed Grievance #333150 challenging the DOC's policy prohibiting inmates in Level 5 housing units from attending Jumu'ah services within the general population. He claimed such prohibition substantially burdened his ability to practice his religion. Defendant Kephart responded on September 13, 2010, stating that this matter was not yet grievable because Plaintiff had not yet fully pursued the matter through the RARC. (Id. ¶ 28.)

On October 29, 2010, Plaintiff submitted a second religious accommodation request. In his request, he sought to be provided with a special Muslim diet known as a Halal diet including Halal meat. In March of 2011, the RARC denied

Plaintiff's request for a Halal diet with meat.  (Doc. 66-1 ¶¶ 29, 30; Doc. 66-2 ¶¶ 23, 24; Doc. 66-3 ¶¶ 23, 25.)  In May of 2011, the Deputy Secretary Klopotoski concurred with the RARC and denied the request.  Klopotoski found that the least restrictive means for an inmate to maintain a Halal diet is to select the Alternative Protein option or to request, via an Inmate Religious Accommodation Request Form, a "No Animal Products" Diet.  (Doc. 66-1 at ¶31; Doc. 66-2 at ¶ 25 and Doc. 66-3 at ¶ 26.)  Throughout his confinement at SCI-Frackville, Plaintiff never submitted a DC-52 requesting a religious accommodation for a No Animal Products Diet.  (Doc. 66-1 ¶ 34; Doc. 66-2 ¶ 34; Doc. 66-3 ¶ 27.)  Plaintiff maintains that he was never aware of or offered a No Animal Products Diet.  Even if he was, Plaintiff claims that these options are not the least restrictive means for him to maintain a Halal Diet, and place a substantial burden on his ability to practice a core tenet of his faith.

On June 7, 2011, Plaintiff filed Grievance #369249 contesting the RARC's denial of his request for a Halal diet with meat.  His grievance was denied on June 21, 2011, and this finding was upheld on appeal by the Facility Manager and the Secretary's Office.  (Doc. 66-1 ¶¶ 32, 33.)

Although Plaintiff's religious accommodation requests have been denied, Defendants state that he is still able to practice those religious beliefs that do not disrupt the order and security of the prison, and are consistent with DOC policy.  He

13

is able to pray and conduct religious rituals in his cell, have one-on-one counseling with staff Chaplains, secure and correspond with outside religious advisors and obtain religious materials and devotional items that are consistent with prison security policies. (Doc. 66-1 ¶ 35; Doc. 66-2 ¶ 27; Doc. 66-3 ¶ 28.)  Plaintiff disputes this statement and claims that the Jewish inmates are accommodated by being provided with a Kosher bag.  However, he does admit that while housed in the SSNU he was allowed to pray five times per day in his cell as required by Islam, possess a Quran, pamphlets, books and other written religious materials, and conduct religious rituals in his cell, and correspond with religious leaders within the community. (Doc. 66-5, Pl.'s Dep. at 15-17.)

During the relevant time period, Defendants state that the SSNU at SCI-Frackville was in compliance with any and all licensure requirements regarding psychiatric and psychological treatment, and any such licensure requirements that were required by DOC Policy 13.8.1, Section 10, which is the section of the "Access to Mental Health Care Procedural Manual" pertaining to the SSNU.  They further state that no licensure is required regarding the SSNU, and that the individuals who provide care and services to inmates confined therein, to the extent required, are licensed professionals.  (Doc. 66–6, Marsh Decl.)  Plaintiff disputes this statement, and contends a license through the Pennsylvania Department of Public Welfare was required.

At no time during his confinement at SCI-Frackville did Plaintiff ever file and grieve to final review any grievance challenging the type/denomination of the Chaplains that provide religious services to inmates confined in the SSNU.  (Doc. 66-1 ¶ 36.)

## IV.   Discussion

### A.   RLUIPA claim

RLUIPA provides, in pertinent part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the government demonstrates that the burden furthers "a compelling governmental interest" and "is the least restrictive means" of doing so. 42 U.S.C. § 2000cc-1(a).

To prevail on a claim under RLUIPA, an inmate must establish a sincerely held, authentic religious belief, the exercise of which the government has substantially burdened.  Cutter v. Wilkinson, 544 U.S. 709, 725 (2005); Washington v. Klem, 497 F.3d 272, 277 (3d Cir. 2007).  A "substantial burden" exists where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive the benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.  Washington, 497 F.3d at 280.

If a plaintiff proves that the government substantially burdened the exercise of a sincerely held religious belief, the burden then shifts to the government, and a court must determine whether the government has demonstrated that the burden was imposed both in furtherance of a compelling government interest and represents the least restrictive means of furthering that compelling government interest. Id. at 282. In making this determination, the court is mindful of the fact that "context matters," Cutter, 544 U.S. at 723 (quoting Grutter v. Bollinger, 539 U.S. 306, 327 (2003)), and gives "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quoting S.Rep.No. 103-111, at 10, U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900).

In this case, Plaintiff claims that Defendants violated his constitutional rights under RLUIPA when his religious accommodation request for a Halal diet with meat was denied.[5] The undisputed record reveals that the DOC provides two meal choices which both satisfy a Halal diet - the "No Animal Products" diet, and the Alternative Protein option offered on mainline. Plaintiff admits choosing the

_____

[5] In his complaint, Plaintiff also claimed that his RLUIPA rights were violated when he was not permitted to leave the SSNU to attend weekly Jumu'ah services. In his brief in opposition to Defendants' motion for summary judgment, he states that he wishes to withdraw this claim from his complaint. (Doc. 75, Pl.'s Opp. Br. n. 2.)

16

Alternative Protein meal option.  He further admits that he had never submitted a religious accommodation request to obtain the "No Animal Products" diet while confined at SCI-Frackville.

While Plaintiff contends that eating the Alternative Protein option does not meet Halal requirements because no meat is included, he fails to produce any evidence that the consumption of meat, Halal or otherwise, is required to practice his faith.  In fact, in his deposition, Plaintiff merely states that the Halal diet <u>permits</u> him to eat meat, so he would <u>like</u> to eat meat.  (Doc. 66-5 at 21-22.)(emphasis added.)  He does not state that meat is a required to practice his faith.  "[T]he majority of circuit and district courts that have looked at this specific issue have concluded there is no such clearly established right to Halal meals, with or without Halal meat, under the First Amendment's Free Exercise of Religion Clause [or] RLUIPA."  <u>Garraway v. Lappin</u>, 2012 WL 959422, *15 (M.D. Pa. March 21, 2012)(citing <u>Patel v. U.S. Bureau of Prisons</u>, 515 F.3d 807 (8th Cir. 2008); <u>see</u> <u>also</u> <u>Williams v. Morton</u>, 343 F.3d 212, 216-22 (3d Cir. 2003).

Moreover, any assertion by Plaintiff that he was being deprived of any protein is completely undermined by the record.  Plaintiff admits that he was receiving the Alternative Protein diet option. (Doc. 65, ¶¶ 33, 34.)  Further, Plaintiff's assertion that he was never informed of or offered the "No Animal Product" diet is without merit as supported by the undisputed record.  The Final

Appeal decision regarding Plaintiff's Halal meat diet grievance informed him that he was able to request a "No Animal Product" diet via an Inmate Religious Accommodation Form. (Doc. 66-1, Attach. 8.)

Even if Plaintiff could prove that Defendants substantially burdened the exercise of his sincerely held religious belief, the undisputed record demonstrates that Defendants had compelling government interests in denying his request for a Halal diet with meat. It is well established that RLUIPA should be applied with particular sensitivity when security concerns are legitimately at issue. "It bears repetition ... that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." Spratt v. Rhode Island Dep't of Corrs., 482 F.3d 33, 39 (1st Cir. 2007), quoting Cutter, 544 U.S. at 725, n. 13; Washington v. Klem, 497 F.3d 272, 283 (3d Cir. 2007). Prison authorities must provide some basis for their concern, and the policy at issue must be narrowly tailored to further this interest by the least restrictive means possible. Klem, 497 F.3d at 283, citing Spratt, 482 F.3d at 39.

In the instant case, declarations submitted by Reverend Klemm, DOC Administrator for Religion and Volunteer Services, Larry Liggitt, SCI-Frackville Chaplaincy Program Director, and Marcia Noles, DOC Chief of Food Services, establish that the provision of Halal meals with meat would give rise to significant additional expense and burden on staff and facilities. Possibly 450,000 Halal meals

18

would be served to more than 5,000 DOC Muslim inmates.  In addition to the cost of the food, there would be increases related to the purchase of additional kitchen equipment, food deliveries, and staff for security purposes in checking the food deliveries.

Plaintiff disputes these additional expenses, and sets forth his own assertions as to how a Halal meat meal can be provided without significant additional expense to the DOC.  However, he submits absolutely no evidence in support of his bald self-serving conclusions.  Because there exists no genuine issue of material fact, summary judgment is warranted in favor of Defendants with respect to the RLUIPA claim.

**B.     Free Exercise Claim**

The court next addresses Plaintiff's contention that he has been denied the right to exercise his religion freely, as guaranteed by the Free Exercise Clause of the First Amendment.  Prison inmates do not forfeit their constitutional right to freely exercise their religion when they enter the prison gates.  See Cruz v. Beto, 405 U.S. 319 (1972)(per curiam).  Incarcerated inmates, however, enjoy their rights under a more limited framework than the average citizen.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).  The fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security may justify limitations on the exercise of constitutional rights by an inmate.

See DeHart v. Horn, 227 F.3d 47, 50-51 (3d Cir. 2000)(en banc).  A prison

regulation that impinges on an inmate's right to free exercise of religion is valid "if

it is reasonably related to legitimate penological interests."  O'Lone, 482 U.S. at

349 (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).

To determine the reasonableness of a prison regulation, the following four

factors as set forth in Turner are to be considered: (1) whether the regulation is

rationally related to a legitimate governmental interest; (2) whether alternative

means of exercising the right remain open to the prisoners; (3) what impact

accommodation of the asserted right will have on prison guards, other inmates, and

the allocation of prison resources; and (4) the availability of "obvious, easy

alternatives" to the challenged regulation.  Turner, 482 U.S. at 89-91.

1.    Jumu'ah Services

Plaintiff submitted a religious accommodation request pursuant to DC-ADM-

819 on September 10, 2010, seeking permission to attend weekly Jumu'ah services

held every Friday in the general population at SCI-Frackville.  In the alternative, he

requested that Jumu'ah services at the prison be broadcast via closed circuit

television to the SSNU.

While Defendants do not dispute the fact that Plaintiff has a sincerely held

religious belief, his request to attend services in the general population was denied

due to security concerns.  As per DC-ADM-819, Custody Level 5 inmates, such as

those housed in the SSNU where Plaintiff was confined at the relevant time, are not permitted to leave their units to attend religious services and programs which take place within the general population of the institution.  The denial of his request to do so was reasonably related to legitimate penological interests of ensuring the safety and security of all inmates and staff, in that Custody Level 5 inmates require a high degree of structure given their behavioral issues.  It is undisputed that the SSNU is designed to provide a specialized treatment program for the inmates confined there who have significant mental health concerns and numerous RHU placements.

Plaintiff was provided with several alternative means of observing his faith. He admits that while housed in the SSNU he was allowed to: pray five times per day; have a Quran, pamphlets, books and other religious materials in his cell; conduct religious rituals in his cell; correspond with religious leaders within the community; and have visitation from staff Chaplains.  Plaintiff attempts to create an issue of fact with respect to where religious services/programs for SSNU inmates take place in the SSNU (at the inmate's cell for Phase 4 and 5 inmates, but outside the cell in the SSNU once promoted to Phase 2 or 3).  However, any such disagreement is not material in that it is undisputed that inmates in Custody Level 5 SSNU housing, regardless of what Phase they are in, are not permitted outside of the unit to attend religious services in the general population. Further, while

21

Plaintiff may attempt to challenge the type/denomination of the Chaplains that provide religious services to the inmates confined in the SSNU at SCI-Frackville, there is no evidence in the record that Plaintiff ever grieved this issue to final review.  Based on the foregoing, the undisputed record reveals that Plaintiff had alternative means available for the exercise of his religious beliefs.

Custody Level 5 inmates require specialized attention and require a high degree of structure.  Due to security concerns and the need to ensure the safety and security of all inmates and staff at SCI-Frackville, there would be a great impact on guards and other inmates if Level 5 inmates were permitted to leave their units for the purpose of attending religious services in the general population.

Plaintiff seeks to have the Jumu'ah services at SCI-Frackville broadcast via closed circuit television to the SSNU as an available alternative.  However, this request was denied due to disciplinary and security concerns within the SSNU. Pursuant to DOC policy, inmates housed in the SSNU who are on Phase 5 through 3 status are not permitted any television privileges.  (Doc. 75-1 at 1-2.)  This is due to disciplinary and security concerns within the SSNU.  Once an inmate earns Phase 2 status in the SSNU, he is permitted in-cell television use with earphones.  (Id. at 1.)  As such, because Plaintiff was only in Phase 3 at the relevant time, he would

22

not be eligible for televison privileges.[6]

### 2.   Halal diet

The Third Circuit Court of Appeals has held that a prison's practice of not providing Halal meat meals was reasonable under <u>Turner</u>, rejecting the inmate's free exercise claim. See <u>Williams v. Morton</u>, 343 F.3d at 221. In <u>Williams</u>, the Court found that a New Jersey state prison's practice of providing inmates with vegetarian meals rather than a Halal meat diet was rationally related to legitimate penological interests including simplified food service, prison security and budgetary constraints.

In the instant case, Defendants submit evidentiary materials demonstrating that the DOC's decision to deny Plaintiff's request for a Halal diet with meat was rationally related to legitimate penological interests similar to those addressed in the <u>Williams</u> case. As stated in the earlier discussion with respect to Plaintiff's RLUIPA claim, the provision of Halal meals with meat would give rise to significant additional expense and burden on staff and facilities, with possibly 450,000 Halal meals a month being served to the DOC's more than 5,000 Muslim inmates. Also, there would necessarily be a need to purchase additional kitchen equipment to cook and serve the food, and provide further staffing for security to

---

[6] Moreover, there is no indication that Plaintiff ever filed an RAR request or filed a proper grievance with respect to television privileges during a time in which he was eligible while in the SSNU.

check the food deliveries. Prior decisions of this court have found reasons of security and simplified food service to be legitimate penological interests. See Fraise, 283 F.3d 506, 517-18 (3d Cir. 2002); DeHart, 227 F.3d at 53. The court is deferential to prison administrators who bear a "significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132, 123 S. Ct. 2162, 2167, 156 L.Ed.2d 162 (2003). Plaintiff has offered no evidentiary materials to dispute those submitted by Defendants on this issue.

The court is next required to determine if the prison has provided Plaintiff with alternative avenues through which he can express his religious beliefs. Where a prison affords the inmate alternative means of expressing his or her religious beliefs, that fact tends to support the conclusion that the regulation is reasonable. DeHart, 227 F.3d at 57. SCI-Frackville provides Muslim inmates with alternative means of expressing their religious beliefs by providing two different pork-free, vegetarian diets, both of which satisfy Muslim dietary constraints. See Williams, 343 F.3d at 219. Plaintiff can choose from either the "No Animals Products" diet or the Alternative Protein option. He has, in fact, chosen to eat the Alternative Protein meal selection. While he claims that he was not offered/had no knowledge of the ability to request a "No Animal Products" diet, the undisputed record demonstrates otherwise. Moreover, Plaintiff offers no evidentiary materials establishing that the

consumption of meat is even required to practice his faith. His claims with respect to the denial of protein due to the lack of meat are undermined by the record in that he admits he has been eating the Alternative Protein meal option.

Without unnecessary elaboration and for the reasons previously discussed, the impact on prison guards, other inmates, and the allocation of prison resources in accommodating Plaintiff's request would be significant, as documented in the record.

Finally, there is no evidence establishing the availability of easy, obvious alternatives. The DOC cannot fully accommodate Plaintiff's request for Halal meat meals for all of the foregoing reasons. As such, because all of the <u>Turner</u> factors have been met, Plaintiff's free exercise claim fails.

### C.   Claims related to SSNU

Plaintiff also raises two claims with respect to the SSNU. He first claims that he was placed in the SSNU without procedural due process. He next claims that SSNU at SCI-Frackville is unlawful because it is not licensed by the Pennsylvania Department of Public Welfare in accordance with 62 Pa. § 1002.

To set forth a procedural due process claim, Plaintiff must establish that he has a protected liberty or property interest. Once he does so, the court next examines whether the available process comports with all constitutional requirements. See <u>Shoats v. Horn</u>, 213 F.3d 140, 143 (3d Cir. 2000). Due process

25

protection for a state-created liberty interest on the part of a prison inmate is "limited to those situations where deprivation of that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' Moreover, the baseline for determining what is 'atypical and significant'–the 'ordinary incidents of prison life'– is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997)(quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).

It is well established that an inmate has no protected liberty interest in being confined in general population and that moving him to a segregated unit does not create a liberty interest. See Sandin, 515 U.S. at 486; Griffin, 112 F.3d at 706; Banks v. Beard, 2006 WL 2192015, *14 (W.D. Pa. Aug. 1, 2006)(placement in Long Term Segregation Unit did not deprive inmate of a liberty interest). Although Plaintiff attempts to cite cases in support of his position that he was entitled to due process protections wherein other courts found atypical and significant hardship conditions to exist, Plaintiff fails to produce any evidence that any such harsh conditions existed in the SSMU at SCI-Frackville. As such, because Plaintiff's placement in the SSNU did not implicate a protected liberty interest, his due process claim fails.

However, even if the court were to find that his placement in the SSNU at

26

SCI-Frackville did implicate a liberty interest under <u>Sandin</u>, the procedures utilized by the DOC to place inmates there satisfy due process.  DOC policy, as set forth in 13.8.1 Access to Mental Health Care Procedures Manual, Section 10 - Secure Special Needs Unit, provides as follows:

> 13.  When an inmate is being recommended for placement in a SSNU, the PRC shall review the recommendation with the inmate and inform him/her of the reason(s) for the transfer recommendation.  The recommendation shall be documented on the DC-141, Part 4, with a copy to the inmate.  The inmate will be given the opportunity to respond to the rationale given and object to his/her placement in a SSNU, if he/she so desires.  The inmate may appeal the recommendation for transfer to the Facility Manager/designee and Central Office, as outlined in Department policy DC-ADM 802, "Administrative Custody" and DC-ADM 801, "Inmate Discipline."

(Doc. 66-1 at 65, 13.8.1, Section 10(E)(13).)  As such, prior to placement in an SSNU, pursuant to DOC procedure, inmates are provided with notice, opportunity to be heard and the right to appeal their placement.  More importantly is the fact that in this case, Plaintiff was placed in the SSNU on June 12, 2009,while confined at SCI-Cresson.  There is no evidence that demonstrates any personal involvement on the part of any of the named Defendants in the decision to place Plaintiff in the SSNU.  Accordingly, Defendants are entitled to summary judgment with respect to this claim.

Plaintiff also claims that his federal rights were violated because the SSNU is not licensed.  He references 50 Pa. § 7105, 62 Pa. §§ 1001 and 1002-03 and 28 U.S.C. § 485.  To the extent he cites to a federal statute, no such statute exists.  To

the extent he challenges the lawfulness of the SSNU on the basis of lack of licensing by the State of Pennsylvania under the Department of Public Welfare, these claims are not properly raised in a federal civil rights action in that he fails to allege conduct on the part of Defendants depriving him of rights, privileges or immunities secured by the Constitution or laws of the United States. See Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995). Pennsylvania statutes are not laws of the United States, and Plaintiff fails to establish how their violation impacts his federal rights.[7]

Further, even if Plaintiff raised a proper § 1983 civil rights claim with respect to the licensing issue, no licensure for the operation of the SSNU is required. The unit operates pursuant to DOC Policy 13.8.1 and any employees providing services to inmates confined in the SSNU, to the extent required, are licensed as required by their specific professions. While in his opposition brief Plaintiff challenges the proper licensing of the SSNU employees at the time he was confined therein, he submits no evidence in support of his bare allegations.[8]

---

[7] In light of the foregoing, it is unnecessary to address Defendants' argument that Plaintiff has also failed to allege any physical injury resulting from the unlawfulness of the SSNU program at SCI-Frackville.

[8] Although Plaintiff submits a memorandum from the U.S. Department of Justice regarding the findings of an investigation into the conditions of confinement at SCI-Cresson (Doc. 75-9, Attach. 2), this document is irrelevant to Plaintiff's claims arising from his confinement in the SSMU at SCI-Frackville.

## V.   Conclusion

For all of the foregoing reasons, the undisputed record supports a finding that Defendants are entitled to summary judgment on all claims.  An appropriate order follows.